

600 SOUTH AVENUE WEST • WESTFIELD, NEW JERSEY 07090
T: 908.654.5000 • F: 908.654.7866 • WWW.LDLKM.COM

CHINA: UNIT 3405A • TEEM TOWER • 208 TIANHE ROAD • TIANHE DISTRICT
GUANGZHOU, GUANGDONG 510620 • CHINA • T: +86 20 3810-3788 • F: +86 20 3810-3789

INTELLECTUAL PROPERTY LAW

Roy H. Wepner
908.518.6306
RWepner@ldlkm.com

**Document Filed Electronically**

September 18, 2013

**VIA FEDERAL EXPRESS** (609.989.2009)
The Honorable Michael A. Shipp
United States District Judge
United States District Court
Clarkson S. Fisher Bldg. & U.S. Courthouse
402 East State Street
Trenton, NJ 08608

Re:     **DIEBOL 6.1-001**
        ***Diebold, Incorporated v. Content Extraction and Transmission LLC***
        **Civil Action No. 12-7640-MAS-TJB**

        -consolidated with-

        *Content Extraction and Transmission LLC v. Wells Fargo Bank,*
        *  National Association*
        Civil Action No. 12-2501-MAS-TJB

        *Content Extraction and Transmission LLC v. The PNC Financial*
        *  Services Group, Inc.*
        Civil Action No. 12-6960-MAS-TJB

Dear Judge Shipp:

        We represent the Plaintiff Diebold, Incorporated in the above-captioned action.

        As Your Honor will recall, on July 31, 2013, the Court issued an opinion and order in the above-referenced related cases holding the four patents at issue in those cases invalid under 35 U.S.C. § 101. Content Extraction and Transmission LLC ("CET") has appealed Your Honor's decision, and its appeals have been docketed at the Federal Circuit as Appeal Nos. 2013-1588 and 2013-1589. Those same four patents are at issue in Diebold's declaratory judgment counts in its first amended complaint seeking declaratory judgments of invalidity and noninfringement of the patents. Those same four patents have also been asserted by CET against Diebold in CET filings characterized as counterclaims and amended counterclaims in the present case, which filings Diebold has asked the Court to strike on procedural grounds.

        On August 19, 2013, Magistrate Judge Bongiovanni conducted an in-person status conference in the present *Diebold* action. During that conference, there appeared to be a consensus among all parties that the Court should be asked to enter a Rule 54(b) final judgment in the present case as to those four invalidated patents. However, after more than two weeks of back-and-forth communications and exchanges of proposed documents by Diebold and CET, the parties have been unable to agree on a proposed order to present to the Court. We have received no response at all on these issues from counsel for the individual Defendants Mitchell Medina, Catherine Elias, and Jean-Marc Zimmerman.



The Honorable Michael A. Shipp
September 18, 2013
Page 2

     Accordingly, we are writing on behalf of Diebold to respectfully request that the Court enter the attached Final Judgment Pursuant To Fed. R. Civ. P. 54(b) in the present case, which is limited to the patent invalidity decision entered in the two consolidated cases (*i.e.*, *PNC* and *Wells Fargo*). Early entry of such a final judgment will potentially facilitate a consolidation of an appeal of this judgment with those in the other two cases.

     If the Court has any questions or concerns, we are of course available to address them at any time.

<div style="margin-left:40%">

Respectfully submitted,

LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
*Attorneys for Plaintiff Diebold, Incorporated*
*In Civil Action No. 12-7640-MAS-TJB*

By: _____
    Roy H. Wepner

</div>

RHW/dg
Attachment

cc:    Counsel of Record (via ECF)

3291474_1.docx

**Document Filed Electronically**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DIEBOLD, INCORPORATED, | : | Civil Action No. 12-7640-MAS-TJB |
|       Plaintiff, | : | |
| | : | |
|     v. | : | District Judge Michael A. Shipp |
| CONTENT EXTRACTION AND | : | Magistrate Judge Tonianne J. Bongiovanni |
| TRANSMISSION LLC, MITCHELL | : | |
| MEDINA, CATHERINE ELIAS, and | : | |
| JEAN-MARC ZIMMERMAN, | : | |
|       Defendants. | : | |
| | x | |

## FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)

Plaintiff Diebold, Incorporated ("Diebold") having filed a first amended complaint against Defendants Content Extraction And Transmission LLC ("CET"), Mitchell Medina, Catherine Elias, and Jean-Marc Zimmerman including, in Count 1, a request for a declaratory judgment of invalidity, unenforceability, and laches with respect to, *inter alia*, U.S. Patent Nos. 5,258,855 ("the '855 Patent"), 5,369,508 ("the '508 Patent"), 5,625,465 ("the '465 Patent"), and 5,768,416 ("the '416 Patent"); and

Diebold's first amended complaint also including, as Count 2, a request for a declaratory judgment of noninfringement as to, *inter alia*, the '855, '508, '465, and '416 Patents; and

CET having filed a document entitled "Counterclaims and Third-Party Complaint" asserting infringement of the '855, '508, '465, and '416 Patents (Dkt.66), and Diebold having filed a motion to dismiss or strike said document pursuant to Fed. R. Civ. P. 7(a), 12, and 13 (Dkt.68); and

CET having filed a document entitled "Answer and Amended Counterclaims" (Dkt.69) asserting infringement of the '855, '508, '465, and '416 Patents, and Diebold having moved to strike said document pursuant to L. Civ. R. 12.2 (Dkt.72); and

The Court having issued a Memorandum Opinion and Order on July 31, 2013, in related actions holding that each of the '855, '508, '465, and '416 Patents are invalid as abstract ideas not patentable under 35 U.S.C. § 101 (*Content Extraction and Transmission LLC v. Wells Fargo Bank, National Association*, Civil Action No. 12-2501-MAS-TJB (Dkts.64, 65); and *Content Extraction and Transmission LLC v. The PNC Financial Services Group, Inc. and PNC Bank National Association*, Civil Action No. 12-6960-MAS-TJB (Dkts.44, 45)); and

The Court having concluded that there is no continuing justiciable controversy between the parties regarding the '855, '508, '465, and '416 Patents with respect to Diebold's request for a declaratory judgment of unenforceability and laches as sought in Count 1 in view of the Court's decision that each of the '855, '508, '465, and '416 Patents is invalid; and

This Court having concluded pursuant to Rule 54(b) of the Federal Rules of Civil Procedure that there is no just reason for delay in entering a final judgment with respect to Counts 1 and 2 of Diebold's first amended complaint insofar as they relate to the '855, '508, '465, and '416 Patents and CET's counterclaims and amended counterclaims documents;

It is accordingly hereby finally ORDERED, ADJUDGED, and DECREED that:

1.  With regard to Count 1 of Diebold's first amended complaint:

    a.  Each of the '855, '508, '465, and '416 Patents is declared and adjudged to be invalid as being directed to abstract ideas that are not patentable under 35 U.S.C. § 101 for the reasons and based on the findings and conclusions set forth in the Court's

2

Memorandum Opinion and Order of July 31, 2013, copies of which are annexed hereto as Exhibit A;

      b.     Insofar as Count 1 of Diebold's first amended complaint is directed to the issues of unenforceability and laches with respect to the '855, '508, '465, and '416 Patents, it is dismissed without prejudice for lack of a continuing case or controversy.

    2.     With regard to Count 2 of Diebold's first amended complaint, it is hereby declared and adjudged that each of the '855, '508, '465, and '416 Patents cannot be infringed in view of the invalidity of said patents pursuant to paragraph 1(a).

    3.     CET's counterclaims (Dkt.66) and amended counterclaims (Dkt.69) documents are dismissed with prejudice on the basis that the '855, '508, '465, and '416 Patents are invalid as being directed to abstract ideas that are not patentable under 35 U.S.C. § 101 for the reasons and based on the findings and conclusions set forth in the Court's Memorandum Opinion and Order of July 31, 2013, copies of which are annexed hereto as Exhibit A, and cannot be infringed. The Court does not reach or address the motions filed by Diebold which assert that such counterclaims and amended counterclaims were not properly filed.

**SO ORDERED:**

Dated:_____

      Trenton, New Jersey                 Michael A. Shipp
                                      United States District Judge

3291416_1.docx

# EXHIBIT A

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CONTENT EXTRACTION AND TRANSMISSION LLC, | : | |
| | : | |
| Plaintiff, | : | No. 12-2501 (MAS) (TJB) |
| | : | |
| v. | : | |
| | : | |
| WELLS FARGO BANK, NATIONAL ASSOCIATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| CONTENT EXTRACTION AND TRANSMISSION LLC, | : | |
| | : | |
| Plaintiff, | : | No. 12-6960 (MAS) (TJB) |
| | : | |
| v. | : | |
| | : | |
| THE PNC FINANCIAL SERVICES GROUP, INC., et al., | : | **MEMORANDUM OPINION** |
| | : | |
| Defendants. | : | |

**SHIPP, District Judge**

 This matter comes before the Court on Defendant the PNC Financial Services Group, Inc., and PNC Bank, N.A.'s (collectively, "PNC" or "Defendant"),[1] Motion to Dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Def.'s Br., ECF No. 6-1.)[2] Plaintiff Content Extraction and Transmission LLC ("Plaintiff" or "CET"), filed Opposition. (Pl.'s Opp'n,

---

[1] For purposes of this Opinion, the Court refers to the PNC entities as a single defendant.

[2] All cites to the record, unless noted otherwise, are to *CET v. PNC*, Civil Action No. 12-6960.

ECF No. 8.) Defendant filed a Reply. (ECF No. 9.) The Court has carefully considered the Parties' submissions and decided the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, and other good cause shown, Defendant's Motion to Dismiss is GRANTED because Plaintiff's U.S Patent Nos. 5,258,855 (the "855 Patent"), 5,369,508 (the "508 Patent"), 5,625,465 (the "465 Patent"), and 5,768,416 (the "416 Patent") (collectively, "the Patents-in-Suit") are invalid as abstract ideas not patentable under 35 U.S.C. § 101.

## I.   **Background**

### A.   **Factual History**

The following facts are drawn from the Complaint and taken as true for purposes of this Opinion. Plaintiff CET is a limited liability company organized under the laws of the State of New Jersey and has its principal place of business in New Jersey. (Compl. ¶ 1, ECF No. 1.) Defendant PNC is a combination of a financial services corporation and a national banking association with its principal place of business in Pennsylvania. (*Id.* ¶¶ 2-3.) CET alleges that PNC is the successor in interest to additional banks that "processed deposits made at ATMs during the six-year period immediately preceding the filing of this Complaint." (*Id.* ¶ 4.)

In the Complaint, Plaintiff alleges ownership over six (6) patents: the 855 Patent, the 508 Patent, the 465 Patent, the 416 Patent, U.S. Patent No. 7,259,887 (the "887 Patent") and U.S. Patent No. 7,474,434 (the "434 Patent"). (*Id.* ¶¶ 9-15.) Plaintiff alleges that PNC has infringed the 855 Patent, the 508 Patent, the 465 Patent, and the 416 Patent.[3]

---

[3] Plaintiff does not allege that PNC has infringed the 887 Patent or 434 Patent.

**B.     The Patents**

The 855 Patent is a process patent that was filed on March 20, 1991 and granted on

November 2, 1993. (ECF No. 1-2.) It contains 77 claims. The Abstract to the 855 Patent states:

> An information processing methodology gives rise to an application program
> interface which includes an automated digitizing unit, such as a scanner, which
> inputs information from a diversity of hard copy documents and stores
> information from the hard copy documents into a memory as stored document
> information. Portions of the stored document information are selected in
> accordance with content instructions which designate portions of the stored
> document information required by a particular application program. The selected
> stored document information is then placed into the transmission format required
> by a particular application program in accordance with transmission format
> instructions. After the information has been transmission formatted, the
> information is transmitted to the application program. In one operational mode,
> the interface interactively prompts the user to identify, on a display, portions of
> the hard copy documents containing information used in application programs or
> for storage.

(*Id.*)

All of the other Patents-in-Suit claim priority to the 855 Patent. They each include a

multitude of claims.[4] As discussed more fully below, the Patents-in-Suit focus on the processing

of information in a three step process. First, information or data from a hard copy document is

gathered by an "automated digitizing unit," such as a scanner, into computer memory. Second,

the information gathered by the scanner is recognized as corresponding to certain data fields.

Third, the information corresponding to the data fields on the hard copy documents are then

stored in corresponding data fields in computer memory. Various iterations of the patents and

claims explicitly insert a user, for example interacting with a display and selecting certain data

fields to be saved, into the process at various steps.

---

[4] The 508 Patent has 46 claims, the 465 Patent has 53 claims, and the 416 Patent has 66 claims.

### C.    Plaintiff's Complaint

CET's Complaint provides a tangible example of the convoluted process alluded to above. The Complaint contains four counts. Each count alleges that one of the Patents-in-Suit was violated in the same manner. CET states:

> Defendants infringed, actively induced the infringement of, and contributorily infringed in this judicial district the [Patents-in-Suit] by processing check and cash deposits made by customers at automatic teller machines ("ATMs") using their envelope-free deposit service such as DepositEasy service, and by processing check deposits made from mobile electronic devices using their mobile deposit service such as the Mobile Deposit service.

(Compl. ¶¶ 17, 22, 27, 32.)

> CET further alleges:

> Defendants' envelope-free deposit service [as well as its mobile deposit service] extracts information from checks and cash deposited at ATMs and then transmits the extracted information to an application program to process the deposits, in a manner defined by the claims of the [Patents-in-Suit], without permission from CET.

(*Id.* ¶¶ 18-19, 23-24, 28-29, 33-34.)

## II.    Legal Standard

### A.    Standard for Motion to Dismiss

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the . . . claim is and the grounds on which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). On a motion to dismiss for failure to state a claim, a "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

A district court conducts a three-part analysis when considering a Rule 12(b)(6) motion. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'take note of the

elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The court, however, must disregard any conclusory allegations proffered in the complaint. *Id.* For example, the court is free to ignore legal conclusions or factually unsupported accusations which merely state that "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, a court must next determine whether the "facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

Determining plausibility is a "context-specific task which requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Plausibility, however, "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 545). In the end, facts which only suggest the "mere possibility of misconduct" fail to show that the plaintiff is entitled to relief. *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

## III.   Analysis

PNC moves pursuant to Rule 12(b)(6) to dismiss Plaintiff's complaint in its entirety alleging that the Patents-in-Suit are abstract ideas that lack patentability pursuant to 35 U.S.C. § 101. The main thrust of PNC's argument is that the Patents-in-Suit merely "encompass 'extracting' or 'identifying' information from a document, 'storing' the information in memory, and sending information to other application programs, in any field of commercial endeavor." (Def.'s Reply 1.) This process is allegedly abstract because the Patents-in-Suit "do nothing more

5

than provide an invitation for practitioners to apply an unknown, undisclosed, and unspecified algorithm to recognize, store, and send information from a document to other applications . . . ." (Def.'s Br. 1.) CET argues that 1) Defendant's motion is premature because a claim construction hearing has not occurred, 2) Defendant's motion fails to address all of the claims contained in the Patents-in-Suit, and 3) the claims "are not directed to abstractions such as purely mental processes, laws of nature, or physical phenomena." (Pl.'s Opp'n 1-2.) As explained more fully below, the Court finds that the Patents-in-Suit are invalid and grants PNC's Motion to Dismiss.

### A.     Patentability under 35 U.S.C. § 101 Generally

Patentability is a question of law "that may be informed by subsidiary factual issues." *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012) (citing *In re Comiskey*, 554 F.3d 967, 976 (Fed. Cir. 2009)). Section § 101 states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." The statute is to be given a "wide scope." *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980)). That scope, however, has its bounds.

The Supreme Court has delineated three exceptions to Section 101's "broad patent-eligibility principles: 'laws of nature, physical phenomena, and abstract ideas.'" *Id.* (quoting *Chakrabarty*, 447 U.S. at 309). Although these exceptions are not found or required in the text of the Patent Act, they "have defined the reach of the statute as a matter of statutory *stare decisis* going back 150 years" and serve to protect "'the storehouse of knowledge of all men . . . .'" *Id.* (citing *Le Roy v. Tatham*, 55 U.S. 156, 174-75 (1852); quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)).

6

Here, according to Defendant, the Court is allegedly confronted with an abstract idea. In order to determine whether the Patents-in-Suit are impermissibly abstract, the Court is guided by a three-part analysis.[5] Invalidity must be demonstrated by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011) (construing 35 U.S.C. § 282). The first two elements of the Court's inquiry are guided by the Machine-or-Transformation Test. Under that test, an invention is a patentable "'process' only if: '(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing.'" *Bilski*, 130 S. Ct. at 3225 (quoting *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008)). Satisfaction of either prong of the test is a "useful and important," although not dispositive, clue as to a claimed invention's patentability. *Id.* at 3227.

Because the Supreme Court did not hold the Machine-or-Transformation Test to be the final and sole arbiter of the patentability of a process, some courts have also considered an additional level of analysis. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011) ("a patent claim's failure to satisfy the machine-or-transformation test is not dispositive of the § 101 inquiry"). The Court must still inquire "more generally" into the "abstract nature of [the] claim . . ." *CyberFone*, 885 F. Supp. 2d at 719 (citing *Cybersource*, 654 F.3d at 1371). This more ephemeral analysis is guided by the following: "abstract ideas constitute disembodied concepts or truths which are not 'useful' from a practical standpoint standing alone, i.e., they are not 'useful' until reduced to some practical application." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 685 F.3d 1341, 1349, *reh'g en banc granted, opinion vacated,* 484 F. App'x 559 (Fed. Cir. 2012) (citing *In re Alappat*, 33 F.3d 1526, 1543 (Fed. Cir. 1994),

---

[5] As noted in *Bilski*, "[t]he § 101 patent-eligibility inquiry is only a threshold test. Even if an invention qualifies as a process, . . . in order to receive the Patent Act's protection the claimed invention must also . . . be novel, *see* § 102, nonobvious, *see* § 103, and fully and particularly described, *see* § 112." 130 S. Ct. at 3225.

*abrogated by In re Bilski*, 545 F.3d 943). Essentially, this final analysis asks whether, even though the patent may have failed the Machine-or-Transformation Test, the Court is convinced that it is not an abstract idea. *See Ultramercial, Inc. v. Hulu, LLC*, 2010-1544, 2013 WL 3111303 (Fed. Cir. June 21, 2013) ("*Ultramercial II*") ("the relevant inquiry is whether a claim, as a whole, includes meaningful limitations restricting it to an application, rather than merely an abstract idea") (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1297 (2012)). The Court will apply the requisite analyses below.

### B.   Formal Claim Construction is not Required

#### 1)   The Parties' Positions

Plaintiff argues that Defendant's motion to dismiss is premature because claim construction has not occurred. (Pl.'s Opp'n 7-11.) More specifically, Plaintiff quotes the Federal Circuit's language in *Ultramercial, LLC v. Hulu, LLC*, stating that "definition of the invention via claim construction can clarify the basic character of the subject matter of the invention. Thus, claim meaning may clarify the actual subject matter . . . and can enlighten, or even answer, questions about subject matter abstractness." (*Id.* at 7) (citing 657 F.3d 1323, 1325 (Fed. Cir. 2011) ("*Ultramercial I*"), *cert. granted, judgment vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 132 S. Ct. 2431 (2012)). Defendant argues that "Plaintiff cannot identify a single construction of a claim term that would impact the analysis required to decide this Motion [and] there is no reason to postpone resolution of this issue until after claim construction." (Def.'s Reply 12.)

#### 2)   Discussion

Claim construction is not required to resolve this motion and determine that the Patents-in-Suit are invalid. As noted by both Parties, "claim construction is not an inviolable prerequisite

8

to a validity determination under § 101" but "will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012). The "basic character of the claimed subject matter" in dispute in this action is clearly evident to the Court and no further construction of the claims is required.

That is not to say, however, that the Court must accept Defendant's contention that the burden rests with Plaintiff to "come forward with a construction that would show the claims *were* eligible." *Ultramercial II*, 2013 WL 3111303, at *14. Rather, in the current procedural posture, the Court must adopt a construction of the claims "most favorable to the patentee" and "the complaint and the patent must by themselves show clear and convincing evidence that the claim is not directed to an application of an abstract idea, but to a disembodied abstract idea itself." *Id.*

Disposition of a patent case at this juncture is appropriate in circumstances such as those present here. *See Bilski*, 130 S. Ct. 3218; *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269 (Fed. Cir. 2013); *CyberFone*, 885 F. Supp. 2d at 715; *Glory Licensing LLC v. Toys R Us, Inc.*, No. 09-4252 (FSH), 2011 WL 1870591 (D.N.J. May 16, 2011), *appeal dismissed*, 459 F. App'x 916 (Fed. Cir. 2011). The Court has carefully reviewed Plaintiff's argument that formal claim construction in this case is required but declines to agree. As explained more fully below, and commensurate with the instruction of the *Ultramercial II* court, the Patents-in-Suit encapsulate invalid abstract ideas, even when construed in the manner most favorable to Plaintiff.

9

### C.    Invalidation of the Patents Does Not Require an Extended Claim by Claim Analysis

Plaintiff correctly maintains that *each* claim contained in the Patents-in-Suit is presumptively valid and may only be deemed invalid by clear and convincing evidence. Plaintiff is incorrect, however, when it argues that Defendant's failure to engage in an extended attack on each of the 242 claims contained in the Patents-in-Suit renders them unchallenged and therefore valid. Where the claims, as here, are substantially similar and linked to the same abstract idea, the Court is free to dispose of the additional claims in a less detailed fashion. *See Bilski v. Kappos*, 130 S. Ct. at 3231 (determining that eleven (11) claims in a patent application were invalidly abstract after only analyzing two (2) of the claims in detail); *CyberFone*, 885 F. Supp. 2d at 710 (invalidating all twenty-four (24) claims of a patent for abstractness after only conducting an analysis of the first claim); and *Glory Licensing LLC*, 2011 WL 1870591 (dismissing three (3) patents—each owned by an entity directly related to Plaintiff CET—containing 121 claims after analyzing only a single claim of a single patent in detail).

### D.    The Machine-or-Transformation Test

"A claim can embrace an abstract idea and be patentable" so long as, "instead of claiming an *application* of an abstract idea, the claim is instead *to* the abstract idea itself." *Ultramercial II*, 2013 WL 3111303, at *7. The Machine-or-Transformation Test is used because it helps illuminate whether a claimed process patent passes the threshold inquiry regarding abstractness: "whether a claim, as a whole, includes *meaningful* limitations restricting it to an application, rather than merely an abstract idea." *Id.* at *8.

As a general matter, an invention that includes a machine as an integral—as opposed to superfluous—component to the claimed process, "would not pre-empt uses of the principle that do not also use the specified machine or apparatus in the manner claimed." *In re Bilski*, 545 F.3d

at 954. Similarly, "a claimed process that transforms a particular article to a specified different state or thing by applying a fundamental principle would not pre-empt the use of the principle to transform any other article, to transform the same article but in a manner not covered by the claim, or to do anything other than transform the specified article." *Id.* At its most basic level, the Machine-or-Transformation Test reveals limitations on the claimed process which indicate that the patent covers application of an abstract idea as opposed to the abstract idea itself.[6]

### 1)   The Machine Prong

In order to satisfy the machine prong of the Machine-or-Transformation Test, the patentee must show that "his claim is tied to a particular machine," such that the machine imparts "meaningful limits on the claim's scope to impart patent-eligibility." *In re Bilski*, 545 F.3d at 961.

### a)   The Parties' Positions

Defendant argues that that the Patents-in-Suit do not meet the machine prong because no "machine, let alone a particular machine, is used to perform any of the claimed steps." (Def.'s Br. 10.) The mere addition of a general purpose computer and an "automated digitizing unit," such as a scanner, to the processes outlined in the Patents-in-Suit, is allegedly insufficient to satisfy this prong of the test. (*Id.*) Moreover, Defendant contends that the Patents-in-Suit's failure to "describe any special programming code or any specific algorithm to perform the claimed functions of 'extracting' or 'identifying' information from a document, 'storing' the information

---

[6] The Federal Circuit has noted the increasingly limited use of the Machine-or-Transformation Test related to information technology patents, as opposed to its high level of relevance when construing industrial and mechanical patents. *See Ultramercial II*, 2013 WL 3111303, at *7 ("While machine-or-transformation logic served well as a tool to evaluate the subject matter of Industrial Age processes, that test has far less application to the inventions of the Information Age.") (citing *Bilski*, 130 S. Ct. at 3227-28).

in memory, and sending the information to other application programs" is "fatal." (*Id.* at 10-11.)
Thus, PNC asserts, "[w]ithout a more specific description of the computer and the algorithm
used to program the computer, the law is well-settled that this is nothing more than a general
purpose computer which does not impose any meaningful limitation on the claim and thus cannot
meet the 'machine' requirement." (*Id.* at 11) (citing *Dealertrack, Inc., v. Huber*, 674 F.3d 1315
(Fed. Cir. 2012); *Fort Props. v. Am. Master Lease, LLC*, 671 F.3d 1317 (Fed. Cir. 2012);
*Cybersource*, 654 F.3d at 1375).

Plaintiff responds that "claim 1 of the '855 patent and claim 1 of the '416 patent are tied
to a particular apparatus, which includes both (1) an automated digitizing unit (or a scanner), and
(2) a computer configured to recognize and store data in a particular (targeted ) way." (Pl.'s
Opp'n 20.) The requirement of these machines in the Patents-in-Suit allegedly adds a meaningful
limitation to the scope of the patents and is not the mere appendage of a general purpose
computer or data-gathering step. (*Id.* at 17-18.) Plaintiff asserts that the "scanner here 'is a
machine and is integral to each of the claims in issue.'" (*Id.* at 18) (citing *SiRF Tech., Inc. v. Int'l
Trade Comm'n*, 601 F.3d 1319, 1332 (Fed. Cir. 2010)).

Regarding the use of the computer, PNC argues that lacking "a specific description of the
computer and the algorithm used to program the computer, the law is well settled that this is
nothing more than a general purpose computer" that imposes no "meaningful limitation" on the
Patents-in-Suit and "thus cannot meet the 'machine' requirement." (Def.'s Reply 3.) Regarding
the Patents-in-Suit's use of a scanner, Defendant argues that it is merely used to gather data, "is
not used in any other step in the claims," and therefore only adds "insignificant pre-solution
activity . . . which does not render a claim patent eligible." (*Id.* at 7-8.)

12

      **b)**      **Discussion**

A "machine," for purposes of this test, is "'a concrete thing, consisting of parts, or of certain devices and combination of devices.' This 'includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result.'" *In re Ferguson*, 558 F.3d 1359, 1364 (Fed. Cir. 2009) (quoting *In re Nuijten*, 500 F.3d 1346, 1355 (Fed. Cir. 2007)). Both a general purpose computer and an automated digitizing unit such as a scanner fall under that definition. Their appendage or assertion into the Patents-in-Suit's claims, however, does not automatically render the Patents-in-Suit valid. Rather, the machines must provide a meaningful limitation upon the claims. A discussion of several recent cases, four decided by the Federal Circuit, demonstrates how CET's addition of a computer and scanner to the Patents-in-Suit fails to add the requisite meaningful limitation.

      **i.**      **Relevant Case Law**

*SiRF* involved two patents[7] related to GPS navigation technology. 601 F.3d at 1322. The primary claim involved a method by which a GPS receiver could "calculate its position without having to wait to receive time information from a satellite, thereby allowing the receiver to calculate its position more quickly and even in weak-signal environments." *Id.* at 1323. An additional claim, "extend[ed] the solution of the [primary patent and claim] from the discrete calculation of a GPS receiver's position at a particular moment to the use of a 'dynamic model' that allows the improved, repeated calculation of a GPS receiver's position as it changes over time." *Id.* These claims were challenged as overly abstract, not sufficiently tied to a machine and capable of being "performed entirely in the human mind." *Id.* at 1333.

---

[7] Four additional patents were involved in the *SiRF* litigation but not subjected to the Federal Circuit's Machine-or-Transformation Test analysis.

The Federal Circuit held that a "GPS receiver is a machine and is integral to each of the claims at issue." *Id.* at 1332. Speaking to the primary patent and claim, the court stated that the calculations and variables at the core of the claimed process could "exist only with respect to a *particular* GPS receiver that receives the [GPS] satellite signals." *Id.* The same was true of the related patent and claim. *Id.* The integral nature of the GPS receiver was clear because the receiver "play[ed] a significant part in permitting the claimed method to be performed, rather than function[ing] solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *Id.* at 1333. The inability of the claimed method to be "performed *without* a" GPS receiver was indicative of the receiver's indispensability to the patented process. *Id.* (emphasis added).

*Dealertrack*, also a Federal Circuit case, arose from an appeal of a district court's grant of summary judgment finding certain claims of a patent invalidly abstract. 674 F.3d at 1317. The claims at issue covered a "computer aided method of managing a credit application" in the automobile retail industry. *Id.* at 1331. Generally, the challenged claims included a process by which: 1) a credit application was received from a remote location, 2) that application was forwarded to certain lenders that may fund the automotive purchase transaction, and 3) an answer was relayed back to the applicant. *Id.* The second step had multiple versions, including sending the application to lenders sequentially until a lending approval was obtained or sending the application to multiple lenders simultaneously. *Id.*

The *Dealertrack* court affirmed the district court and found that the "claims [were] invalid as being directed to an abstract idea preemptive of a fundamental concept or idea that would foreclose innovation in this area." *Id.* at 1333. The court described the claim as merely "processing information through a clearinghouse" and that the steps outlined by the claimant did

14

not "'impose meaningful limits on the claim's scope.'" *Id.* (quoting *In re Bilski*, 545 F.3d at 961-62). The court further reasoned that the "claims are silent as to how a computer aids the method, the extent to which a computer aids the method, or the significance of a computer to the performance of the method. The undefined phrase 'computer aided' is no less abstract than the idea of a clearinghouse itself." *Id.* Moreover, the mere addition of "a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible." *Id.* (citing *SiRF*, 601 F.3d at 1333). Similarly, limiting the claims to the field of auto loans did not provide the requisite meaningful limitation. *Id.* at 1334 ("The notion of using a clearinghouse generally and using a clearinghouse specifically to apply for car loans, like the relationship between hedging and hedging in the energy market in *Bilski* . . . , is of no consequence without more.)

*Bancorp* provides another useful lens through which to evaluate the Patents-in-Suit. In *Bancorp*, the Federal Circuit considered an appeal regarding the patent eligibility of "systems and methods for administering and tracking the value of life insurance policies in separate accounts." 687 F.3d at 1269. The court construed the plaintiff-patentee's argument as "boil[ing] down to the contention that because its claims are limited to being performed on a computer, they cannot claim only an abstract idea." *Id.* at 1277. The court rejected that argument and observed that the "computer required by some of Bancorp's claims is employed only for its most basic function, the performance of repetitive calculations, and as such does not impose meaningful limits on the scope of those claims." *Id.* at 1278. The court found that "Bancorp's patents 'attempt[ed] to patent the use of the abstract idea of [managing a stable value protected life insurance policy] and then instruct[ed] the use of well-known [calculations] to help establish

15

some of the inputs into the equation.'" *Id.* (quoting *Bilski*, 130 S. Ct. at 3231) (alterations in original).

The *Bancorp* court further noted that the computer alluded to in the claims was not part of a "technological advance" of any sort and was "merely employ[ed] to track, reconcile, and administer a life insurance policy with a stable value component . . . ." *Id.* at 1279. This constituted nothing more than using a computer to "more efficiently [perform] what could otherwise be accomplished manually." *Id.* Simply stated: "[u]sing a computer to accelerate an ineligible mental process does not make that process patent-eligible." *Id.* As such, the *Bancorp* court concluded that "[t]he district court correctly held that without the computer limitations nothing remains in the claims but the abstract idea of managing a stable value protected life insurance policy by performing calculations and manipulating the results." *Id.* at 1280. The limitation of the claims to the "life insurance market" did not alter the court's conclusion. *Id.* (citing *Bilski*, 130 S. Ct. at 3231).

*CyberFone* is also instructive. The patent at issue was described as a:

> [S]ystem for automatically capturing data at a point of transaction (e.g., a telephone in "transaction entry mode") and transmitting the data to one or more databases for processing and storage. A transaction entry device formats input data from a user into a data transaction, which is then transferred to an external (local or remote) database server. The server "explodes" the data transaction into its component parts "on a system-specific basis so that each component part has a one-to-one correspondence with a file."

*CyberFone*, 885 F. Supp. 2d at 712 (internal citations omitted). The defendant in *CyberFone* argued that the patent and claims at issue "merely claim[ed] the abstract concept of gathering, organizing and forwarding data." *Id.* at 716. The plaintiff asserted that the data was transformed during the process and that a telephone was required by the patent. *Id.*

16

Before the *CyberFone* court began its analysis of the Machine-or-Transformation Test, it found it appropriate and useful to break down the claim into core components. *Id.* at 717 ("Analyzing and interpreting a claim by breaking it down into its relevant steps, as the court has done here, is consistent with Supreme Court precedent, *see e.g., Prometheus*, 132 S. Ct. at 1297-98, and consistent with the Federal Circuit's guidance in *CLS*, 685 F.3d at 1351-52.") The court described the claim at issue as a three step process:

> The first [step] entails "obtaining data transaction information entered on a telephone from a single transmission." In other words, the first step involves obtaining or capturing data. The second step entails "forming a plurality of different exploded transactions" from the single transmission. In other words, the second step involves the sorting or organizing of data into data subsets. The third and final step entails "sending said different exploded data transactions over a channel to different destinations." In other words, the last step involves sending data to a storage location.

*Id.*

Relying significantly on the cases described above, the court noted that "*Bancorp* and *SiRF* [exist on a spectrum] with respect to computer-based implementation limitations. At one end of the spectrum is *Bancorp* and a general purpose computer that is generically performing calculations; at the other end is *SiRF* and a GPS receiver that performs specific operations essential to the claimed methods." *Id.* at 718. Speaking to the claim before it, the court noted that the telephone referenced in the claim "simply function[ed] as a means for collecting data whereas the real focus of the claim is the sorting and storing." *Id.* Moreover, "[t]o the extent that a machine is also involved in the sorting or organizing step (step two), that machine exists on the *Bancorp* end of the spectrum. The machine is just a general purpose computing device being asked to do some unspecified sorting function." *Id.* at 719. The court concluded that "[e]ssentially plaintiff has claimed nothing more than the idea of sorting via machine." *Id.* The

17

use of a machine was not integral to the claim and therefore did not create a meaningful limitation on the claims challenged. As such, they were struck down as invalidly abstract. *Id.*

The final case to be reviewed is the Federal Circuit's most recent application of the machine prong, released just over one month ago. In *Ultramercial II*, the patent claimed "a method for distributing copyrighted products (*e.g.*, songs, movies, books) over the Internet where the consumer receives a copyrighted product for free in exchange for viewing an advertisement, and the advertiser pays for the copyrighted content." 2013 WL 3111303, at *1. The court viewed the claim as comprising the following steps:

> (1) receiving media products from a copyright holder, (2) selecting an advertisement to be associated with each media product, (3) providing said media products for sale on an Internet website, (4) restricting general public access to the media products, (5) offering free access to said media products on the condition that the consumer view the advertising, (6) receiving a request from a consumer to view the advertising, (7) facilitating the display of advertising and any required interaction with the advertising, (8) allowing the consumer access to the associated media product after such display and interaction, if any, (9) recording this transaction in an activity log, and (10) receiving payment from the advertiser.

*Id.* at *15.

Before it analyzed the claim before it, the court encapsulated the essence of the analysis regarding the machine prong, especially in the realm of computer software and methods: As long as a "computer plays a meaningful role in the performance of the claimed invention, it is as a matter of fact not likely to pre-empt virtually all uses of an underlying abstract idea, leaving the invention patent eligible." *Id.* at *13.

The *Ultramercial II* court found that the claimed invention did not attempt to patent an abstract idea. It first noted that the "claim does not cover the use of advertising as currency disassociated with any specific application of that activity. It was error for the district court to strip away these limitations and instead imagine some 'core' of the invention." *Id.* at *15. The

court further reasoned that "it is clear that several steps plainly require that the method be performed through computers, on the internet, and in a cyber-market environment." *Id.* The presence of an "extensive computer interface" and lack of any claim to the concept of "sell[ing] advertising using a computer" generally "meaningfully limit[ed] the 'abstract idea at the core' of the claims." *Id.* These limitations, via both the requirement for an extensive highly programmed computer interface, as well as the "ten specific steps in the claim," sufficiently allowed the court to view the claims at issue as an *application of an abstract idea* rather than an *abstract idea alone.*

### ii.      The Patents-in-Suit Fail the Machine Prong

As noted in *CyberFone*, the cases above outline a spectrum with *SiRF* and *Ultramercial II* on one end and *Bancorp*, *Dealertrack* and *CyberFone* on the other. Here, the Patents-in-Suit are located on the end of the spectrum inhabited by *Bancorp*, *Dealertrack*, and *CyberFone*. The scanner and computer referenced in the Patents-in-Suit are not integral to the claims and none of the various steps contained in the claims in the Patents-in-Suit otherwise tie the claims to a machine in a manner that would indicate that the Patents-in-Suit are an *application* of an abstract idea rather than the idea *itself.*

Although the Court must not oversimplify the claims presented to it, *see Ultramercial II*, 2013 WL 3111303 at *8, *15, the Court can state with certainty that it has concluded by clear and convincing evidence that the claims contained in the Patents-in-Suit do not pass the machine prong. Defendant's contention that the "claims are not directed to any specific application, . . . or any specific machine-implemented intermediate steps," but rather, seek to effectuate "the broad idea of extracting, storing and sending information . . . in any industry or commercial endeavor, for any purpose, without leaving any room for other methods" is correct. (Def.'s Reply 5.)

Unlike *Ultramercial II*, the Patents-in-Suit are not meaningfully limited by the addition of a scanner or general purpose computer.

First, the use of the scanner is pre-solution activity that does not provide any meaningful limitation on the extent of the claims contained in the Patents-in-Suit. Unlike *SiRF*, the scanner here is not integral to the first step of the claims in which it is featured because the step in which it is used can be accomplished without using a scanner or similar device. Simply stated, gathering information from a hardcopy document can be done by hand and manually input into a general purpose computer. The fact that a scanner, or other machine, may make a given step more efficient does not render the machine integral. *See Dealertrack*, 674 F.3d at 1333-34; *Bancorp*, 687 F.3d at 1279 (addition of a machine to speed up a process which could otherwise be done manually fails the machine prong). The rationale applied in *CyberFone* is similarly persuasive. There, the court did not consider the use of the telephone in the primary step whereby information was received for further processing integral to the larger idea of "sorting and storing data." *CyberFone*, 885 F. Supp. 2d at 718. The addition of the scanner to the core activity in the Patents-in-Suit—associating information from a given field on a hard copy document to a corresponding field in a computer memory location or database—is not the type of integrality found in *SiRF* and is insufficient to pass the machine prong.

Second, the use of a computer more generally in the second and third steps of the Patents-in-Suit does not meaningfully limit their scope. Assuming, *arguendo*, that all of the steps alluded to in the Patents-in-Suit beyond the importation of data from the scanner took place on a computer, the Patents-in-Suit do not limit their scope sufficiently. For example, the computerized process in *Ultramercial II* was clearly limited to "monetizing and distributing copyrighted

products over the internet." 2013 WL 3111303, at *14. Here, there are no such restrictions on the scope of the gathering, recognizing, and sorting steps allegedly covered by the Patents-in-Suit.

Moreover, the mere use of a computer to more quickly and efficiently—or as in the case of the alleged infringement in this case, process deposits at an ATM—accomplish a given task does not create meaningful limitation on an otherwise abstract and wide-ranging concept. *See Dealertrack*, 674 F.3d at 1333-34 (a "computer aided" limitation that "does not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent" is not sufficient to pass the machine prong). Mere transposition of information from a hardcopy document to a computerized database or application according to user instructions, even accomplished on a computer, does not meet the machine prong. In fact, the analysis in *CyberFone* regarding the second and third steps of the Patents-in-Suit needs little further elaboration and is apt: "[t]o the extent that a machine is also involved in the sorting or organizing step (step two), that machine exists on the *Bancorp* end of the spectrum. The machine is just a general purpose computing device being asked to do some unspecified sorting function." 885 F. Supp. 2d at 719. The same reasoning applies here.

The presence of a computer does not meaningfully limit the basic flaw in the Patents-in-Suit: they attempt to patent the abstract idea of extracting information from a hardcopy document, recognize certain information on that document and save certain user selected information in computer memory. The breadth of the Patents-in-Suit is staggering and the inclusion of a scanner and computer into the process confers no meaningful limit upon their scope. As such, the Court has concluded that the Patents-in-Suit do not pass the machine prong of the Machine-or-Transformation Test.

### 2)    The Transformation Prong

"A claimed process is patent-eligible if it transforms an article into a different state or thing. This transformation must be central to the purpose of the claimed process." *In re Bilski*, 545 F.3d at 962. For example, "[i]t is virtually self-evident that a process for a chemical or physical transformation of *physical objects or substances* is patent-eligible subject matter." *Id.* The question is more complicated, however, when "information-age processes" and "electronically-manipulated data" are involved. *Id.* at 962.

CET contends that the Patents-in-Suit pass the transformation prong because they use a "scanner to transform ink-on-paper into bit-mapped pixels" and that a computer also transforms "the bit-mapped pixels into machine-readable variable (or field) values stored in targeted memory locations . . . ." (Pl.'s Opp'n 21.) PNC argues that "[n]one of the claimed steps in the [Patents-in-Suit] effects a transformation of an article. Instead, the claims address a mere transfer of data from a hard copy document to a computer memory." (Def.'s Br. 15.) The Court agrees with PNC.

An extended analysis of this issue is not required. As the Federal Circuit recently and unequivocally stated in *Cybersource*, "mere manipulation or reorganization of data . . . does not satisfy the transformation prong." 645 F.3d at 1375. A similar conclusion was reached by the court in *Glory Licensing*, where it stated that "a 'mere transfer' of data from an electronic or hard copy document to an application program" does not constitute transformation of the underlying data. 2011 WL 1870591 at *4. *CyberFone* is consistent with *Cybersource* and *Glory Licensing*: organizing data into subsets does not render a transformation. *CyberFone*, 885 F. Supp. 2d at 717. Similarly, computer memory is not transformed when it receives electronic data. *Id.* Contrary to CET's arguments otherwise, no transformation takes places. The *conversion* of the

22

hardcopy documents into a bitmapped image which is then manipulated and stored into computer memory does not constitute a transformation of the underlying data contained in the hardcopy document. The Patents-in-Suit fail the transformation prong of the Machine-or-Transformation Test.

### E.    General Inquiry as to Abstractness

"Defining 'abstractness' has presented difficult problems, particularly for the § 101 'process' category." *Ultramercial II*, 2013 WL 3111303 at *6. As noted above, "a process need not use a computer, or some machine, in order to avoid 'abstractness.'" *Id.* As most recently defined by the Federal Circuit, relying upon Merriam-Webster's Dictionary, "[a]n abstract idea is one that has no reference to material objects or specific examples—*i.e.*, it is not concrete." *Id.* at *7. The inquiry is whether the claimed invention is an application of an abstract idea or the abstract idea itself. Meaningful limitation on the scope of the idea, and its purported application, are highly relevant to a determination that the idea *itself* is not being patented.

This inquiry is guided by several discrete concepts. First, "a claim is not meaningfully limited if it merely describes an abstract idea or simply adds 'apply it.'" *Id.* at *10 (citing *Prometheus,* 132 S. Ct. at 1294, 1297). A claim is overly broad and abstract if it would cover "essentially all uses of the idea." *Id.* Stated differently, "[i]t is not the breadth or narrowness of the abstract idea that is relevant, but whether the claim covers every practical application of that abstract idea." *Id.* The addition of "only insignificant or token pre- or post-solution activity—such as identifying a relevant audience, a category of use, field of use, or technological environment" does not meaningfully limit a claim. *Id.* (citations omitted).

Second, "the Supreme Court has stated that a claim is not meaningfully limited if its purported limitations provide no real direction, cover all possible ways to achieve the provided

23

result, or are overly-generalized." *Id.* at *11 (citing *Prometheus*, 132 S. Ct. at 1300). This means that "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Prometheus*, 132 S. Ct. at 1300.

Here, the Court is presented with an abstract idea regarding the extraction of information from hardcopy documents and the processing of information contained in those documents. As noted above, the integration of a scanner or computer into the claimed process does not provide any meaningful limitation on the Patents-in-Suit's scope. Similarly, no meaningful transformation of the information in the underlying data contained in the hardcopy documents occurs. Similar to the claimed process in *CyberFone*, the Patents-in-Suit, "broken down into its component parts, recite[] steps by which data is obtained, sorted and stored." *CyberFone*, 885 F. Supp. 2d at 719. As such, "[t]hese steps represent nothing more than a disembodied concept of data sorting and storage" and the Court is left with the inexorable conclusion that "the abstract nature" of the Patents-in-Suit is "manifestly apparent." *Id.* The Patents-in-Suit represent abstract concepts and are not eligible for patent protection.

## IV.   <u>Conclusion</u>

For the reasons set forth above, and other good cause shown, it is hereby ordered that Defendant's Motion to Dismiss is GRANTED and this case will be closed. Due to the invalidity of the Patents-in-Suit, Civil Action No. 12-2501, *CET v. Wells Fargo, N.A.*, is also DISMISSED.


MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: July 31, 2013

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CONTENT EXTRACTION AND TRANSMISSION LLC, | : | |
| | : | |
| Plaintiff, | : | No. 12-2501 (MAS) (TJB) |
| | : | |
| v. | : | |
| | : | |
| WELLS FARGO BANK, NATIONAL ASSOCIATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| CONTENT EXTRACTION AND TRANSMISSION LLC, | : | |
| | : | |
| Plaintiff, | : | No. 12-6960 (MAS) (TJB) |
| | : | |
| v. | : | |
| | : | |
| THE PNC FINANCIAL SERVICES GROUP, INC., et al., | : | **ORDER** |
| | : | |
| Defendants. | : | |

     This matter comes before the Court on Defendant the PNC Financial Services Group, Inc., and PNC Bank, N.A.'s (collectively, "PNC" or "Defendant"),[1] Motion to Dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Def.'s Br., ECF No. 6-1.)[2] Plaintiff Content Extraction and Transmission LLC ("Plaintiff" or "CET"), filed Opposition. (Pl.'s Opp'n, ECF No. 8.) Defendant filed a Reply. (ECF No. 9.) The Court has carefully considered the Parties' submissions and decided the matter without oral argument pursuant to Local Civil Rule

---

[1] For purposes of this Order, the Court refers to the PNC entities as a single defendant.

[2] All cites to the record, unless noted otherwise, are to *CET v. PNC*, Civil Action No. 12-6960.

78.1. For the reasons set forth in the accompanying Opinion issued today, and other good cause shown,

**IT IS**, on this 31st day of July, 2013, **ORDERED** that:

1) Defendant's Motion to Dismiss is granted.

2) Plaintiff's U.S Patent Nos. 5,258,855 (the "855 Patent"), 5,369,508 (the "508 Patent"), 5,625,465 (the "465 Patent"), and 5,768,416 (the "416 Patent") are declared invalid as abstract ideas not patentable under 35 U.S.C. § 101.

3) The Clerk is ordered to close both civil actions listed in the above caption.

4) This Order and accompanying Opinion shall also be docketed in Civil Action No. 12-7640.

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**